IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAURENCE STONE, | : | |
| Petitioner | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BEAR, STEARNS & CO., INC., et al. | : | NO. 2:11-cv-5118 |
| Respondents. | : | |

MEMORANDUM ORDER

AND NOW, this 29th day of May, 2012, upon consideration of Petitioner Laurence Stone's Amended Petition to Vacate (Doc. No. 19) and Respondents' Opposition to Petitioner's Petition to Vacate Arbitration Award and Cross-Petition to Confirm Arbitration Award (Doc. No. 20), it is hereby ORDERED as follows:

1.     Petitioner Laurence Stone's Amended Petition to Vacate (Doc. No. 19) is DENIED.

2.     Respondents' Cross-Petition to Confirm Arbitration Award (Doc. No. 20) is GRANTED.

3.     Respondents' request for attorneys' fees and costs is DENIED.

4.     The Clerk of Court is directed to close this matter for statistical purposes.

I.     Introduction

This case requires us to address several interesting and open questions of law concerning judicial review of an arbitration award.  Laurence Stone, a Pennsylvania businessman and investor, lost millions of dollars investing with Bear Stearns.  Stone subsequently filed a $7.6 million FINRA arbitration claim seeking to hold Bear Stearns responsible for his losses.  With the parties' input, FINRA appointed a three-person panel to hear the case.  One of the arbitrators was Jerrilyn Marston.

Marston's FINRA biography, which the parties received prior to selecting the panel, cursorily noted that she had a "family member" associated with the "University of Pennsylvania."  In fact, Marston's husband, Dr. Richard Marston, is a well-known professor of finance at the Wharton

School who regularly lectures to brokerage firms, insurance companies, banks, and investors. Marston had previously disclosed to FINRA her husband's ties to the securities industry, but FINRA never incorporated the information into Marston's biography.

The arbitration did not go well for Stone.  The panel unanimously sanctioned him $15,000 for discovery violations mere weeks before the first hearing, and in July of 2011, the three arbitrators unanimously rejected all of Stone's claims.  A few days later, Stone started digging.  He spent twenty (20) hours, more or less, painstakingly researching each of the three arbitrators, looking for evidence that they were biased against him.  By his own admission, Stone had done no background investigation on the arbitrators at any time before he lost his case, although he certainly could have done so.

Stone's sleuthing uncovered the relationship between arbitrator Marston and Dr. Marston, as well as Dr. Marston's ties to the financial sector.  Stone brought this information to his lawyers and eventually filed this lawsuit seeking to overturn the adverse arbitration award.  In Stone's opinion, given Dr. Marston's close relationship with the securities industry, arbitrator Marston should never have heard his case.  Further, according to Stone, Marston's alleged non-disclosure of her husband's professional dealings requires vacatur of the award on three separate grounds.  First, Stone contends that Marston demonstrated "evident partiality" against him by virtue of her purported failure to disclose.  9 U.S.C. § 10(a)(2).  Second, Stone argues that the aforementioned failure to disclose constitutes "misbehavior" by Marston under 9 U.S.C. § 10(a)(3).  And finally, Stone asserts that Marston "exceeded [her] powers" as an arbitrator as provided in 9 U.S.C. § 10(a)(4) because FINRA improperly designated her as a "public arbitrator."

As explained herein, we reject Stone's invitation to overturn the panel's unanimous decision. Arbitration awards are entitled to extreme deference, <u>Dluhos v. Strasberg</u>, 321 F.3d 365, 370 (3d Cir.

2003), and the grounds for vacatur focus on "egregious departures from the parties' agreed-upon arbitration." Hall St. Assocs. v. Mattel, Inc., 552 U.S. 576, 586 (2008).  As discussed in detail *infra*, Stone *did* disclose her husband's affiliation with the securities industry; unfortunately, that disclosure just never made it to Stone.  Although Marston could have been more diligent in updating her disclosures, we cannot say that her conduct constitutes either "evident partiality" or "misbehavior" warranting vacatur under Section 10(a)(2) or 10(a)(3) of the Federal Arbitration Act (FAA).  Additionally, even if Marston did not qualify as a "public arbitrator," her participation in Stone's case (1) did not fall so far outside the parties' agreed-upon arbitration as to require vacatur under Section 10(a)(4), and (2) constituted harmless error in any event because the three arbitrators rendered a unanimous decision.  Finally, even if Stone could show proper grounds for vacatur, he waived any failure-to-disclose-based challenge to the award because he failed to investigate the arbitrators as diligently *before* the arbitration as he did *after* he lost.  In this respect, Stone's admitted actions show him to be the quintessential sore loser improperly seeking a second bite at the apple.

II.    Factual Background and Procedural History

      Petitioner Laurence Stone ("Petitioner" or "Stone") lost millions of dollars investing in a Bear, Stearns[1] ("Bear Stearns" or "Respondent") hedge fund that held residential mortgage-backed securities before that market collapsed in 2007.  Stone blames Bear Stearns (now J.P. Morgan) for his losses.  In Stone's eyes, Bear Stearns fraudulently induced and misled him into investing in the fund.  In April of 2008, Stone filed a FINRA[2] arbitration claim saying as much and seeking damages of $7.6 million.  (See Doc. No. 20-8).

---

      [1]Petitioner also names J.P. Morgan Securities LLC as a Respondent in this matter, asserting that J.P. Morgan is the successor in interest to Bear Stearns pursuant to the companies' 2008 merger. Respondents have not argued otherwise.

      [2]FINRA, the Financial Industry Regulatory Authority, is a non-governmental regulator of securities firms doing business in the United States.

The FINRA rules then in effect called for the appointment of a three-person panel consisting of two "public arbitrators" and one "non-public arbitrator" to hear Stone's claim.  See FINRA Rules 12400, 12401, 12403.  FINRA provides detailed definitions of a "public arbitrator," see Rule 12100(u), and a "non-public arbitrator," see Rule 12100(p), but the general gist is this: public arbitrators should not be too closely tied to the securities industry, while non-public arbitrators should have significant securities-related experience.

In Stone's case, FINRA generated and provided to the parties random lists of arbitrators as follows: (1) a list of eight arbitrators from the FINRA non-public arbitrator roster; (2) a list of eight arbitrators from the FINRA public arbitrator roster; and (3) a list of eight public arbitrators from the FINRA chairperson roster.  See Rule 12403.  Along with these lists, FINRA sent an arbitrator disclosure report (ADR) for each of the twenty-four arbitrators, providing the employment history and other background information about each arbitrator, including education, prior awards, and conflict disclosures.  (See, e.g., Doc. No. 19 Ex. B (ADR of Jerrilyn Marston)).  Using this information, the parties ranked and/or struck the arbitrators on the lists.  FINRA then assigned a three person panel to hear Stone's case based on ranking and availability.

By his own admission, Stone himself had absolutely nothing to do with the selection of the arbitrators in his case.  (See Doc. No. 20-4 (Stone Tr. 21-25)).  Even though Stone had over $7 million at stake and knew that the arbitration panel would act as his "jury, so to speak," Stone "didn't think about . . . if it was important who was on the panel" prior to the arbitration.  (Id. 23:17-24:24).  Indeed, Stone did no independent research on the arbitrators at that time.  (Id. 29:4-15, 36:21-37:5).  Instead, Stone relied on his attorneys to conduct due diligence on the arbitration panel candidates.  (Id. 34:19-35:4).  According to one of the lawyers who handled Stone's arbitration, he and his

colleagues investigated the potential arbitrators by doing internet research, looking at their prior FINRA arbitration awards, and reviewing their ADRs.  (Doc. No. 19 Ex. S).

In the end, with the parties' input, FINRA assigned Gordon Wase (public arbitrator and chairperson), Jerrilyn Marston (public arbitrator), and Dale Pope (non-public arbitrator) to Stone's case.  (Doc. No. 20-8).  The controversy here surrounds arbitrator Marston ("Marston").  Specifically, Stone alleges that Marston improperly failed to disclose information pertaining to her husband Dr. Richard Marston ("Dr. Marston"), a professor of finance at the Wharton School of the University of Pennsylvania, and his ties to the securities industry.  As discussed *infra*, Stone unearthed this information about the Marstons while thoroughly and systematically digging for dirt on each of the three arbitrators shortly after they ruled unanimously against him.  Stone could have done this research earlier, before the panel was selected, and certainly before he lost his case.  (Stone Tr. 74:13-75:17).  But he investigated the arbitrators only *after* the adverse decision because, at that point, his "disenchantment was extreme because [he] had lost."  (Id. 76:1-5).

In any event, Stone contends that if Marston had disclosed this newly-discovered information beforehand, she never would have been eligible to serve as a public arbitrator at all.[3]  Therefore, says Stone, Marston's failure to disclose her husband's relationship with the securities industry in general, and J.P. Morgan in particular, "created an impression of partiality and concealed Ms. Marston's lack of qualification to serve, thus requiring vacatur of the Award" under Sections 10(a)(2), 10(a)(3), and 10(a)(4) of the Federal Arbitration Act.  (Doc. No. 19, at 3).

---

[3]Specifically, Stone argues that Marston cannot properly be classified as a "public arbitrator" under FINRA rules because her husband (1) is a director of a company, W.P. Carey, that owns a registered broker-dealer, Carey Financial, LLC, see Rule 12100(u)(7), and (2) devotes more than 20% of his work to the securities industry, see Rules 12100(u)(1), (u)(8), (p)(3).

But Stone's argument is factually flawed because Marston *did disclose* her husband's affiliation with the securities industry to FINRA, at least in broad strokes.  Stone (and his attorneys) just never received this disclosure because it did not show-up on Marston's ADR.  Stone's counsel describes the circumstances surrounding Marston's disclosure-that-wasn't as a "perfect storm" of missteps by FINRA and Marston herself.  The story begins in the mid-1990's, when a friend of Marston's approached her about becoming an arbitrator.  (Doc. No. 19 Ex. E (Marston Tr. 20-23)). Marston then contacted the head of FINRA's Washington office and obtained an application form. Even before filling-out the application, Marston informed FINRA of her husband's securities-related dealings:

> I called [the head of the Washington office] again and I said I want to get this out on the record with you, my husband teaches and is a very prominent professor at the University of Pennsylvania.  He speaks widely in securities matters . . . And I said, frankly, these rules are opaque to me . . . Is this something that disqualifies me [from being an arbitrator]?

(Marston Tr. 22:1-19).

The FINRA official essentially replied that she wasn't sure and advised Marston to disclose the potential conflict "as broadly as you can and then invite . . . questions."  (Id. 22:13-19)  So Marston did just that.  In response to a question in the FINRA application about whether she had family in the securities business, Marston answered "Yes" and elaborated:

> My husband is a Professor of Finance at the Wharton School of the University of Pennsylvania.  In that capacity, he has spoken to brokers, traders, and financial consultants from various investment banks and brokerage houses, and Industry Groups such as the Securities Institute and IMCA.  Should you wish more information, I would be happy to provide it.

 (Doc. No. 19 Ex. C).

But no one from FINRA followed-up with Marston about her husband's activities.  (Marston Tr. 24:18-23).  Instead, FINRA inexplicably translated Marston's relatively detailed disclosure about

her husband into "Family Member has a relationship with [the] University of Pennsylvania" -- a single line on Marston's ADR. (Doc. No. 19 Ex. D). In 2005, Marston tried to amend this description in her ADR to read "Family Member is faculty member, Wharton School, University of Pennsylvania, and gives seminars to financial consultants and investors." (Id.; Marston Tr. 25-28). But again, for reasons unknown, this amendment never showed-up on FINRA's ADR for Marston. As a result, the ADR that Stone and his attorneys received for Marston noted only that Marston had a family member associated with the University of Pennsylvania; it did not reflect Dr. Marston's faculty position at Wharton or his securities-related dealings. (Doc. No. 19 Ex. B). Despite the fact that FINRA imposes an ongoing duty to disclose on its arbitrators, Marston did not clarify or supplement her ADR disclosures at any point throughout Stone's arbitration, even though she was given the opportunity to do so at the beginning of each hearing. (Doc. No. 19 Ex. G). In Marston's opinion, she had already disclosed her husband's professional activities to FINRA early-on, so there was no need for her to re-disclose old issues. (Marston Tr. 49:18-50:6).

Additionally, Marston made a specific effort to discover any potential conflicts once she learned FINRA had assigned her to Stone's case. In particular, Marston asked her husband if he had done any work for Bear Stearns, the respondent in Stone's arbitration. Dr. Marston said that Bears Stearns no longer existed because J.P. Morgan bought it, and he had not done work for J.P. Morgan since they "fired [him] in the late 1990s."[4] (Marston Tr. 53). More recently, in May of 2009,[5] Dr. Marston gave a paid keynote speech, arranged through a speaking agency, at a conference sponsored

---

[4]For his part, Dr. Marston confirmed that he worked as a consultant for "the old J.P. Morgan," until Chase Manhattan bought it in the late 1990s. Specifically, Marston helped train J.P. Morgan analysts on foreign exchanges and international risk. When Chase took over, it eliminated the training program. (Doc. No. 19 Ex. J (Dr. Marston Tr. 43-44)).

[5]This speech occurred in between the time when the arbitration panel was selected in late 2008 and the first evidentiary hearing in Stone's arbitration in September of 2010.

by J.P. Morgan.  (Dr. Marston Tr. 12-13; Doc. No. 19 Ex. K).  However, it is unclear whether Dr.

Marston knew who sponsored the conference before he agreed to give the speech.  (Id.).  And while

arbitrator Marston generally knew when her husband traveled to give speeches, she "doubts" she

knew of J.P. Morgan's involvement with this event.  (Marston Tr. 53:23-54:11).

   Also, in the fall of 2009,[6] Dr. Marston took a position on the board of W.P. Carey.  (Dr.

Marston Tr. 35-41).  In the fall of 2010, Dr. Marston was elected to the Investment Committee of

Carey Asset Management, which reviews and approves Carey's real estate investments.  (Doc. No. 19

Ex. N; Dr. Marston Tr. 39-40, 55-57).  Carey has a complicated organizational structure, but it

appears that Dr. Marston also sat on the board of Carey Asset Management, which owns Carey

Financial LLC, a registered broker-dealer.  (Doc. No. 19, at 13).  Both Dr. Marston and arbitrator

Marston aver that neither knew of the relationship between Carey Asset Management and Carey

Financial LLC before Stone filed this lawsuit.  (Dr. Marston Tr. 40-41; Marston Tr. 44, 51-52).

   More generally, Marston described her husband's professional activities as follows:

> He is an academic and a researcher.  He is an expert on markets and he speaks very
> often on the state of the economy, on the state of the markets.  He's got a very good
> track record.  He has a lot of credibility . . . as his career developed, he became a
> real advocate for the investing public and a critic of a lot of practices in the
> securities industry and he spoke widely about that.

(Marston Tr. 48).  Dr. Marston's most recent book on investing confirms that he saw himself as

someone with "perspective from the investor's side of the advisor-investor relationship."  (Doc. No.

19 Ex. I, at xiv).  In fact, Dr. Marston runs a program at Wharton counseling ultra-high net worth

investors such as Stone.  (Id.).

---

[6]Like the J.P. Morgan speech, this took place after Marston was appointed to Stone's
arbitration panel in late 2008 but before the first evidentiary hearing in September of 2010.

Coming back to the Stone arbitration, the panel was selected in late 2008 but did not hold its first evidentiary hearing until September of 2010.  (Doc. No. 20-8).  Just weeks prior to this first hearing, the panel sanctioned Stone to the tune of $15,000 for discovery violations.  (Id.).  Although Stone was upset and "mild[ly] concern[ed]" that this panel could give him a fair hearing, he did no background investigation on the three arbitrators and never objected to the composition of the panel until after he lost (Stone Tr. 44-53).  Further, Stone admits that during the arbitration hearings, he saw nothing to suggest that Marston was biased against him:

> Q.    Okay.  And was there ever any conduct exhibited by Jerrilyn Marston that led you to believe that she was not completely fair and impartial?
>
> A.    None that I could specifically think of.

(Stone Tr. 53:12-17).

In July of 2011, the panel issued a unanimous decision dismissing Stone's claims in their entirety.  (Doc. No. 20-8; Stone Tr. 53-54).  A few days later, Stone started researching the backgrounds of all three arbitrators.  (Stone Tr. 55).  Stone hoped to get the decision overturned by finding "relationships or circumstances that might have created an appearance of bias" on the part of the arbitrators.  (Id. 58).  Stone estimates that he spent six to eight hours investigating each one of the three panelists.  (Id. 61-64).  This twenty or so hours of work, primarily on Google, yielded the connection between arbitrator Marston and Dr. Marston, and Dr. Marston and the financial industry.  Stone then spent at least another eight hours delving deeper into Dr. Marston's background.  (Id. 74:13-19).  Stone admits that he could have done all of this research sooner if he had wanted to.  (Id. 75:9-17).  Stone then brought this information to his attorneys' attention and eventually filed this suit seeking to vacate the arbitrators' decision.

III.   Legal Analysis

    A.   Jurisdiction

"The Federal Arbitration Act itself, 9 U.S.C. § 1 *et seq.*, does not create federal question jurisdiction. Rather, an independent basis of jurisdiction is needed" for us to either confirm or vacate an arbitration award. Pfizer Inc. v. Uprichard, 422 F.3d 124, 128 n.5 (3d Cir. 2005) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n.32 (1983)); Fox v. Faust, 239 Fed. App'x 715, 717 (3d Cir. 2007) (non-precedential) (same). Here, we have diversity jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. § 1332. (Doc. No. 1 ¶¶ 6-11).

    B.   The Judiciary's Highly Deferential and Limited Review of Arbitration Awards

Courts have long recognized the importance of finality in the context of arbitration. See, e.g., Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 683 (7th Cir. 1983) (undermining finality of arbitration would run "contrary to the purpose of the United States Arbitration Act of making arbitration a swift, inexpensive, and effective substitute for judicial dispute resolution."); Fidelity Fed. Bank, FSB v. Durga Ma Corp., 386 F.3d 1306, 1313 (9th Cir. 2004) (recognizing "policy favoring the finality of arbitration awards."); cf. Sutter v. Oxford Health Plans LLC, 675 F.3d 215, 219 (3d Cir. 2012) (acknowledging "strong federal policy in favor of commercial arbitration."). If a losing party could easily overturn an adverse arbitration award through judicial review, it would make little sense for parties to arbitrate a dispute in the first place.

Therefore, we must afford the arbitrators' decision extreme deference. Dluhos v. Strasberg, 321 F.3d 365, 370 (3d Cir. 2003). Or as the Supreme Court recently put it, a petitioner seeking to vacate an arbitration award must clear a "high hurdle." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 (2010). More specifically, we may only vacate an arbitration award on the four (4) narrow grounds provided by the FAA in 9 U.S.C. § 10. Ario v. Underwriting Members

of Syndicate 53 at Lloyds for 1998 Year of Account, 618 F.3d 277, 295 (3d Cir. 2010) (citing Hall St., 552 U.S. at 590).

In this case, Stone has argued for vacatur on three of the four FAA grounds: evident partiality under § 10(a)(2); misbehavior under § 10(a)(3); and exceeding powers under § 10(a)(4). In its recent Hall Street opinion, the Supreme Court emphasized that these particular avenues for overturning an arbitration award "address *egregious departures* from the parties' agreed-upon arbitration" and focus on "*extreme arbitral conduct*." Hall St., 552 U.S. at 586 (emphasis added). This only reaffirms what we previously said: an arbitration award must stand absent exceptional circumstances. In addition, the party proposing vacatur (here, Stone) bears a "heavy burden" of proving that one of the "exceedingly narrow circumstances" warranting vacatur applies. See Dunkley v. Mellon Investor Servs., 378 Fed. App'x 169, 171-72 (3d Cir. 2010) (non-precedential) (citation omitted); Handley v. Chase Bank USA NA, 387 Fed. App'x 166, 168 (3d Cir. 2010) (non-precedential) (citation omitted).

C.    Evident Partiality Under 9 U.S.C. § 10(a)(2)

Stone first argues that arbitrator Marston's failure to disclose her husband's securities industry ties and prior relationship with J.P. Morgan constitutes "evident partiality" under Section 10(a)(2) and thus mandates vacatur of the award. We disagree. Section 10(a)(2) provides one of the four statutory grounds for vacatur:

> In any of the following cases the United States court in and for the district wherein the award was made *may* make an order vacating the award upon the application of any party to the arbitration . . . (2) where there was *evident partiality* or corruption in the arbitrators, or either of them.

9 U.S.C. § 10(a)(2) (emphasis added).

Preliminarily, we note that the FAA's vacatur provision gives us discretion when it comes to nullifying an arbitration award. See § 10(a) (we "may" vacate the award under the appropriate

circumstances, one of which is "evident partiality" by the arbitrator(s)).  Before deciding whether

Marston's alleged failure to disclose evidences "evident partiality" against Stone, we must first

determine what "evident partiality" means.  This is no easy task, as the parties (and the courts)

disagree on the appropriate standard.  Respondents, relying on an oft-cited footnote from the Third

Circuit's 1994 opinion in Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, argue for a stringent

"evident partiality" standard which would make it more difficult for us to vacate the award:

> In order to show "evident partiality," "the challenging party must show 'a
> reasonable person would *have to conclude that the arbitrator was partial*' to the
> other party to the arbitration."  Apperson v. Fleet Carrier Corp., 879 F.2d 1344,
> 1358 (6th Cir.1989) (quotation omitted), cert. denied, 495 U.S. 947 (1990).
> "Evident partiality" is strong language and requires proof of circumstances
> "*powerfully suggestive of bias*."  Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d
> 673, 681-82 (7th Cir.), cert. denied, 464 U.S. 1009 (1983), mandate modified, 728
> F.2d 943 (7th Cir.1984).

Kaplan, 19 F.3d at 1523 n.30 (emphasis added).

For present purposes, we label this the "actual bias" standard.

On the other hand, Stone, relying on Justice Black's forty-year-old opinion in Commonwealth

Coatings Corp. v. Continental Casualty Co., 393 U.S. 145 (1968), contends that we should vacate an

arbitration award whenever an arbitrator fails to "disclose to the parties any dealings that *might create*

*an impression of possible bias*."  Id. at 149 (emphasis added).  We label this the "appearance of bias"

standard.  This formulation of "evident partiality" undoubtedly favors those seeking to overturn

arbitration awards, as the universe of non-disclosures that "might create an impression of possible

bias" is quite large.  The Third Circuit has recognized but not yet resolved this apparent conflict in

the law.  See HSM Constr. Servs., Inc. v. MDC Sys., Inc., 239 Fed. App'x 748, 752-53 (3d Cir. 2007)

(non-precedential).

The uncertainty stems from the unusual nature of the Supreme Court's <u>Commonwealth</u> <u>Coatings</u> opinion.  Factually, the <u>Commonwealth Coatings</u> case concerned an arbitrator's failure to disclose his own "repeated and significant" business relationship with one of the parties, a relationship that "went so far as to include the rendering of services on the very projects involved in [the] lawsuit."  393 U.S. at 146.  On these extreme facts, Justice Black, delivering "the opinion of the Court," interpreted "evident partiality" to encompass an arbitrator's failure to "disclose to the parties any dealings that might create an impression of possible bias."  <u>Id.</u> at 147-49.

In concurrence, Justice White, joined by Justice Marshall, stated he was "glad to join" Justice Black's opinion but then went on to add significant qualifications to it.  For example, Justice Black would hold arbitrators to a higher standard of impartiality than judges because arbitrators "have completely free rein to decide the law as well as the facts and are not subject to appellate review."  <u>Id.</u> at 148-49.  Conversely, Justice White stated that "[t]he Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges."  <u>Id.</u> at 150 (White, J., concurring).  While Justice White, like Justice Black, stressed the importance of arbitrator disclosure, Justice White sought to cabin the Court's holding: "But it is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed."  <u>Id.</u> at 151-52 (White, J., concurring).  In other words, Justice Black and Justice White actually agreed on little but the result.  Further complicating matters, Justices White's concurrence was pivotal to the Court's judgment because three Justices dissented.  <u>Id.</u> at 152-55.  This has importance because when "no one view garners a majority of the Justices . . . the 'holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'"  <u>U.S. v.</u>

Naranjo, 426 F.3d 221, 231 (3d Cir. 2005) (quoting Marks v. United States, 430 U.S. 188, 193 (1977)).

Given all this, reasonable minds can disagree about which opinion -- Justice Black's or Justice White's -- should guide us on the "evident partiality" question.  Compare Positive Software Solutions, Inc. v. New Century Mortg. Corp., 476 F.3d 278, 281-83 (5th Cir. 2007) (holding that Justice White's concurrence controls and endorsing a practically-oriented "reasonable impression of bias" standard), with Crow Constr. v. Jeffrey M. Brown Assoc. Inc., 264 F. Supp. 2d 217, 220-24 (E.D. Pa. 2003) (holding that Justice Black's opinion controls and endorsing the "appearance of bias" standard).  We happen to agree that Justice White's concurring opinion better reflects the Court's holding in Commonwealth Coatings, largely for the reasons articulated by the Positive Software Solutions court.  In particular, this view properly "accords scope to the full White opinion, unlike the view that focuses on the introductory 'glad to join' sentence."  Positive Software Solutions, 476 F.3d at 282.  Like other like-minded courts, we simply cannot reconcile the substance of Justice White's concurrence with Justice Black's opinion.  This is the majority view today.  Id. at 282-83 (cataloging cases).

In any event, it is not our decision to make.  In Kaplan, the Third Circuit implicitly endorsed Justice White's opinion as binding by fashioning the court's "evident partiality" standard according to Apperson, 879 F.2d at 1358 (6th Cir.1989) and Leatherby, 714 F.2d at 681-82 (7th Cir. 1983).  See Kaplan, 19 F.3d at 1523 n.30.  Both Apperson and Leatherby, and by extension the Third Circuit, have concluded that the White opinion, not the Black opinion, controls the "evident partiality" inquiry.  As such, the "appearance of bias" standard favored by Stone and derived from Justice Black's plurality-plus opinion in Commonwealth Coatings does not govern our analysis in this case.

But this raises another issue with respect to the proper meaning of "evident partiality."  While Justice White made clear what the <u>Commonwealth Coatings</u> Court was *not* deciding (that arbitrators are held to the same standards as judges), 393 U.S. at 150, and what arbitrators did *not* have to do ("provide the parties with [a] complete and unexpurgated business biography"), <u>id.</u> at 151, he did not define "evident partiality."  In this vacuum, lower courts have created their own definitions.  <u>See</u> <u>Leatherby</u>, 714 F.2d at 682 (remarking that "[a]lthough it is *difficult to extract from the cases more than a mood*, the mood is one of reluctance to set aside arbitration awards for failure of the arbitrator to disclose a relationship with a party.") (emphasis added).  Most relevant to us, the Third Circuit has said that to prevail on an evident partiality challenge, the challenging party "must show a reasonable person would have to conclude that the arbitrator was partial," which "requires proof of circumstances powerfully suggestive of bias."  <u>Kaplan</u>, 19 F.3d at 1523 n.30 (citations and internal quotations omitted).

In our view, Justice White's controlling concurrence in <u>Commonwealth Coatings</u> does not foreclose <u>Kaplan</u>'s "actual bias" standard, and this standard best embodies the attitude of more recent Supreme Court jurisprudence equating "evident partiality" to "*extreme* arbitral conduct."  <u>Hall St.</u>, 552 U.S. at 586 (emphasis added).  Moreover, the words Congress chose, "evident partiality," most naturally mean "actual bias," not mere "appearance of bias."  <u>See</u> <u>Leatherby</u>, 714 F.2d at 681 ("Read literally, section 10(b) would require proof of actual bias ('evident partiality').").  The statute says "*evident* partiality," not "potential partiality" or "the appearance of partiality."  This has particular importance given the current Court's views on the primacy of statutory text and "ordinary meaning" when it comes to statutory interpretation.  <u>See</u>, <u>e.g.</u>, <u>Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S</u>,

132 S. Ct. 1670, 1680 (2012); <u>Taniguchi v. Kan Pacific Saipan, Ltd.</u>, No. 10–1472, 2012 WL 1810216, at *5 (May 21, 2012).[7]

Stone takes the position that <u>Kaplan</u>'s "actual bias" standard does not apply to failure-to-disclose-type "evident partiality" challenges.  (Doc. No. 19, at 23-25).  Stone reasons that <u>Commonwealth Coatings</u>, which *was* a failure to disclose case, espoused an "appearance of bias" test for "evident partiality," while <u>Kaplan</u>, which *was not*, governs only if the alleged bias stems from something other than non-disclosure.  The <u>Crow Construction</u> court in this District took this approach.  <u>See</u> 264 F. Supp. 2d at 220-24 (E.D. Pa. 2003).  We do not find Stone's argument persuasive.  First, as discussed *supra*, Justice Black did not speak for the Court when he adopted Stone's preferred "appearance of bias" standard in <u>Commonwealth Coatings</u>.  This is true regardless of whether we consider <u>Kaplan</u>'s "actual bias" standard as binding in failure to disclose cases.

Stone's position is not absolutely without merit.  We do see some logical basis for distinguishing between evident partiality challenges based on a failure to disclose and other kinds of evident partiality challenges.  For the most part, an arbitrator has complete control over his or her disclosures.[8]  A rule that harshly punishes arbitrators for failing to disclose even arguably relevant information should encourage more disclosure on the front-end, thus minimizing potential problems at the back-end (e.g., evident partiality challenges such as this one).  The "appearance of bias" standard favored by Stone is just such a rule.  In some respects, one might say that an arbitrator who

---

[7]When interpreting a statute, we typically start with the text and then, if necessary, move on to consider other interpretive guides.  Here, out of necessity, we have done the opposite.  As a district court, we do not construe "evident partiality" on a blank slate.  Third Circuit and Supreme Court precedent binds us, so we began there.

[8]Of course, this case presents an exception to the rule.  As detailed above, Marston tried at least twice to disclose her husband's business dealings to FINRA, but that information never reached Stone.

finds his award overturned for failing to disclose something has no one to blame but himself.  If in doubt, disclose.

On the other hand, an arbitrator cannot easily control the parties' perception of him or her during the arbitration itself.  The law cannot make it too easy for arbitration losers to overturn unfavorable decisions by claiming that an arbitrator made a stray negative comment; or rolled his eyes; or looked askance at one person or another.  The "actual bias" standard protects an arbitration award against these kinds of easily manufactured and largely frivolous challenges.

However, we still believe that Kaplan's actual bias standard for evident partiality should and does apply to non-disclosure situations.  For one thing, the Third Circuit relied on Leatherby for its proposition that evident partiality "requires proof of circumstances powerfully suggestive of bias." Kaplan, 19 F.3d at 1523 n.30.  Leatherby is a failure-to-disclose case, so it stands to reason that the Third Circuit, like the Seventh Circuit in Leatherby, would support an "actual bias" standard in the failure-to-disclose context.  A recent Third Circuit panel decision confirms this supposition.  See Bapu Corp. v. Choice Hotels Int'l, Inc., 371 Fed. App'x 306, 309-10 (3d Cir. 2010) (non-precedential) (applying Kaplan's "actual bias" standard for evident partiality in failure-to-disclose case).

Additionally, as discussed *supra*, the "actual bias" standard holds true to the statutory language of Section 10(a)(2), which by its terms requires "evident partiality" to overturn an arbitration award.  This is strong language, to put it mildly.  And the statute makes no special exception or allowance for non-disclosure cases; no matter what the theory, a petitioner must prove "evident partiality" (or corruption) for vacatur under § 10(a)(2).

Finally, the "actual bias" standard helps ensure that courts will adequately respect the finality of the arbitration process.  Without the promise of finality, arbitration loses much of its appeal.

17

Therefore, by insisting on proof "powerfully suggestive of bias" before vacating an arbitration award, we honor the policy underlying the Federal Arbitration Act, namely to make "arbitration a swift, inexpensive, and effective substitute for judicial dispute resolution." Leatherby, 714 F.2d at 683.

Here, we have no difficulty concluding that Stone has failed to show circumstances so *powerfully suggestive of bias* that a reasonable person would *have* to believe that Marston was partial to Respondents.  Remember, "failure to disclose," in and of itself, is *not* a basis for vacating an arbitration award.  Instead, Marston's alleged non-disclosure of her husband's business dealings has relevance in the vacatur context only to the extent that the non-disclosure reveals evident partiality against Stone.  See Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire & Marine Ins. Co., 668 F.3d 60, 76-77 (2d Cir. 2012) (remarking that courts should not "vacate an award solely because an arbitrator fails to consistently live up to his or her announced standards for disclosure, or to conform in every instance to the parties' respective expectations regarding disclosure.  The nondisclosure does not by itself constitute evident partiality.  The question is whether the facts that were not disclosed suggest a material conflict of interest.").

Here, Marston tried twice to disclose her husband's securities industry ties to FINRA.  This is not the conduct of someone with a hidden agenda.  It is regrettable that Stone did not receive the information beforehand, during the arbitrator selection process.  However, because the statutory grounds for vacatur focus on the *arbitrator, not the parties*, what Marston disclosed (or tried to disclose) has much more probative value than what Stone actually received.  In other words, the fact that FINRA sent Stone a less-than-complete ADR for Marston says little about Marston's feelings about Stone or Respondents in this case.  See Lucent Techs. Inc. v. Tatung Co., 379 F.3d 24, 26-27 (2d Cir. 2004) (citing with approval district court's opinion that vacating award "where the arbitrator has disclosed potential conflicts of interest to the [arbitration association] but the [association]

thereafter did not forward the information to a party . . . 'would serve no public purpose.'").  Also, while Marston's (attempted) disclosures could have been more detailed and precise, nothing requires an arbitrator to furnish the parties with a "complete and unexpurgated business biography." Commonwealth Coatings, 393 U.S. at 151.

In addition, Dr. Marston's relationship with J.P. Morgan is much too tenuous for us to conclude that Marston was evidently partial against Stone.  While Dr. Marston taught a J.P. Morgan training course for several years, that arrangement ended in the late 1990's, many years before Stone's arbitration began.  And although Dr. Marston gave a paid keynote speech at a J.P. Morgan-sponsored conference in May of 2009, nothing in the record suggests that this was anything more than a one-time deal; we have no evidence of a significant and ongoing relationship between Dr. Marston and J.P. Morgan.  Additionally, Dr. Marston may not have even known the identity of the conference sponsor before he agreed to speak; a third-party vendor arranged his appearance.  And even more importantly (because our inquiry must focus on arbitrator Marston's supposed bias, not Dr. Marston's), Marston "doubts" she knew that J.P. Morgan sponsored this event.  This lack of knowledge undercuts any inference of bias; unknown facts will not influence an arbitrator because such facts cannot, by definition, enter into an arbitrator's thought process.  See Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc., 304 F.3d 1331, 1341 (11th Cir. 2002) (finding of partiality requires arbitrator to be "aware of the facts comprising a potential conflict.").  The same reasoning applies to Dr. Marston's involvement with W.P. Carey.  Although Dr. Marston sat on the board of a Carey entity that controlled a broker-dealer, neither he nor arbitrator Marston knew about it until *after* the arbitration, when Stone filed this suit.

Stone argues that, regardless of whether Marston knew about these potential conflicts, they in fact existed and should have disqualified Marston from serving as a "public arbitrator."  Stone also

complains that Marston failed in her FINRA-mandated ongoing duty to disclose by stating that she had nothing to add to her disclosures at the beginning of each arbitration session.  Assuming this is factually true, Marston's shortcomings still do not warrant vacatur.  Remember, the FAA permits vacatur only in narrow circumstances such as "evident partiality," not for mere "failure to disclose" or "FINRA rule infractions."  See, e.g., Scandinavian Reinsurance, 668 F.3d at 76-77 n.22 (declaring that "[e]ven where an arbitrator fails to abide by arbitral or ethical rules concerning disclosure, such a failure does not, in itself, entitle a losing party to vacatur.") (citing Positive Software Solutions, 476 F.3d at 285 n.5; Montez v. Prudential Sec., Inc., 260 F.3d 980, 984 (8th Cir. 2001); ANR Coal Co., 173 F.3d at 499; Leatherby, 714 F.2d at 680-81).

We also point out that a reasonable person could very well believe that Dr. Marston's business background, if imputed to his wife as Stone would have us do, might actually inure *to Stone's benefit*.  For example, J.P. Morgan apparently "fired" Stone in the late 1990's.  That might lead one to wonder whether Dr. Marston, and by implication arbitrator Marston, held some sort of grudge against J.P. Morgan.  Additionally, Dr. Marston advises high-net-worth investors, so perhaps the Marstons would sympathize with an individual such as Stone, himself a high-net-worth investor who lost a significant amount of money (or so a reasonable person might believe).  Finally, Stone testified that he perceived no bias from Marston during the arbitration process itself.  All of this cuts against a finding of "evident partiality."

In the end, Stone has not met his heavy burden of proving that a reasonable person would have to believe that Marston was partial to Respondents.  Kaplan, 19 F.3d at 1523 n.30.  We simply see no circumstances powerfully suggestive of anti-Stone or pro-Respondent bias.  Id.  Therefore, Section 10(a)(2)'s "evident partiality" provision does not permit vacatur in this case.

D.    Misbehavior Under 9 U.S.C. § 10(a)(3)

Stone also asks us to vacate the award under Section 10(a)(3), which provides for vacatur "where the arbitrators were guilty of . . . any . . . misbehavior by which the rights of any party have been prejudiced."  Specifically, Stone argues that Marston misbehaved by failing to disclose potential conflicts and thus denied Stone the opportunity to remove her from the panel (or, presumably, to pick a different public arbitrator to begin with).  We find this argument unconvincing.

Preliminarily, we note the relative novelty of Stone's position.  The Second Circuit recently remarked that the court was unaware of *any* cases "that have addressed claims of insufficient [arbitrator] disclosure under the 'other misbehavior' prong." STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 74 (2d Cir. 2011).[9]  In theory, we do not see why "misbehavior" would categorically exclude instances of non-disclosure.  See Positive Software Solutions, 476 F.3d at 288 (Reavley, J., dissenting) (commenting that "[i]t might . . . be said that an arbitrator who fails to make a significant disclosure is guilty of 'misbehavior'" under § 10(a)(3)).  But in practice, failures-to-disclose that would constitute "misbehavior" under Section 10(a)(3) would likely also reflect "evident partiality," which Section 10(a)(2) already addresses.  This might explain the dearth of case law on failure-to-disclose-type "misbehavior."

---

[9]Stone cites a 2012 unpublished order by a Southern District of Florida judge vacating an arbitration award under Section 10(a)(3)'s "misbehavior" prong for an arbitrator's failure to disclose a conflict of interest.  See Citigroup Global Markets, Inc. v. Berghorst, 11-cv-80250 (S.D. Fla. Jan. 20, 2012) (Doc. No. 29).  The Berghorst court only briefly addressed the § 10(a)(3) issue, citing no cases to support the court's position.  Additionally, Marston's alleged non-disclosure pales in comparison to the arbitrator's in Berghorst.  In that case, the non-public FINRA arbitrator failed to disclose that he had been waging a heated legal battle against his former employer, Wells Fargo / Wachovia (a registered broker-dealer), for wrongful termination, among other things.  Citigroup, also a registered broker-dealer, lost the arbitration with the challenged arbitrator casting the deciding vote.

In any event, the Third Circuit has set an extremely high bar for vacatur-worthy "misbehavior." We may not vacate an arbitration aware for "misbehavior" under Section 10(a)(3) unless the petitioner shows misconduct so severe that it denies the aggrieved party a fundamentally fair hearing. Apex Fountain Sales, Inc. v. Kleinfeld, 818 F.2d 1089, 1094-95 (3d Cir. 1987) (holding that "[u]nder Federal law, misconduct apart from corruption, fraud, or partiality in the arbitrators justifies reversal only if it so prejudices the rights of a party that it denies the party a fundamentally fair hearing."); Teamsters Local 312 v. Matlack, Inc., 118 F.3d 985, 995 (3d Cir. 1997) (same); Sherrock Bros., Inc. v. DaimlerChrysler Motors Co., 260 Fed. App'x 497, 501 (3d Cir. 2008) (non-precedential) (same). Other circuits take a similar approach. See, e.g., Bradley v. Merrill Lynch & Co., 344 Fed. App'x 689, 690-91 (2d Cir. 2009) ("When a party asserts that the arbitrator engaged in misconduct, 'except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review.'") (citation omitted); Laws v. Morgan Stanley Dean Witter, 452 F.3d 398, 399 (5th Cir. 2006) ("To constitute misconduct requiring vacation of an award, an error in the arbitrator's determination must . . . so affect the rights of a party that it may be said that he was deprived of a fair hearing.") (citation omitted); Louisiana D. Brown 1992 Irrevocable Trust v. Peabody Coal Co., No. 99-3322, 2000 WL 178554, at *6 (6th Cir. Feb. 8, 2000) ("[T]he standard for judicial review of arbitration procedures is merely whether a party to arbitration has been denied a fundamentally fair hearing.") (citation omitted). This interpretation of "misbehavior," limited to deprivations of fundamental fairness, fully comports with the Supreme Court's pronouncement in Hall Street that the terms "misconduct" and "misbehavior" (among others) in Section 10 of the FAA denote "extreme arbitral conduct." 552 U.S. at 586.

Here, for all the reasons discussed in relation to "evident partiality," we see no "misbehavior" by arbitrator Marston that could fairly be characterized as "extreme arbitral conduct." At worst,

Marston was careless for failing to diligently update her ADR.  The record reflects no scienter on her part.  Additionally, it is unclear whether Marston's alleged non-disclosure actually prejudiced Stone at all, much less to such an extent that it denied him a fundamentally fair hearing.  As discussed *supra*, Dr. Marston's professional work and long-ago business dealings with J.P. Morgan might lead one to conclude that Marston may have been inclined to favor Stone over J.P. Morgan, not *vice versa*.[10]  Also, Stone candidly admits he felt no unfair bias against him throughout the course of the arbitration.  Finally, although Stone perhaps *could* have challenged Marston's presence on the panel if he had known about her husband earlier, Stone has provided no evidence that he actually *would* have mounted such a challenge.  Under the circumstances, to the extent Marston failed to disclose her husband's professional activities to Stone, the non-disclosure did not deprive Stone of a fundamentally fair hearing.

E.     Exceeding Powers Under 9 U.S.C. § 10(a)(4)

Finally, Stone seeks vacatur pursuant to Section 10(a)(4)'s "exceeding powers" provision, which allows a court to vacate an arbitration award "where the arbitrators exceeded their powers."  Stone's rather clever argument proceeds as follows.  The parties agreed that FINRA rules would govern this arbitration.  These rules call for the appointment of a three-person panel consisting of two public arbitrators and one non-public arbitrator.  Because of her husband's professional activities, Marston was not eligible to serve as a public arbitrator.  Therefore, her improper service as a public arbitrator violated the parties' arbitration agreement, so any award rendered by the panel exceeds the

---

[10]We certainly do not say or imply that Marston actually did prefer Stone, or in any way decided the case except strictly on the merits.  We only mention these scenarios to show that the evidence on which Stone hangs his hat is equivocal at best.

authority of the panel under 9 U.S.C. § 10(a)(4).  This argument has some logical appeal but fails for several reasons.[11]

First, the Third Circuit has recently delineated the categories of conduct that may suffice for a court to vacate an award as in excess of the arbitrators' powers, namely "when [an arbitrator] [1] decides an issue not submitted to him, [2] grants relief in a form that cannot be rationally derived from the parties' agreement and submissions, or [3] issues an award that is so completely irrational that it lacks support altogether."  Sutter, 675 F.3d at 219-20.  Stone has not argued that the arbitrators' conduct here falls within any of these three categories, and plainly it does not.  The three arbitrators in this case decided the issues submitted to them and unanimously denied Stone's claims, an outcome the parties' must have envisioned when agreeing to arbitrate the dispute (given that Bear Stearns sought this form of relief; that is, no relief at all for Stone).

Second, in this circuit, so long as an arbitrator makes a "good faith attempt" to comply with his or her mandate, "even serious errors of law or fact will not subject [the arbitrator's] award to vacatur."  Id. at 220 (citation omitted).  On this record, we conclude that Marston in particular, and the three-person arbitration panel in general, made just such a good faith attempt.  Even assuming that FINRA's rules constitute a contract between the parties to a FINRA arbitration, Marston tried to comply with FINRA's conflict disclosure rules by, e.g., disclosing her husband's business dealings to FINRA (twice) and asking her husband if he had previously worked for Respondents in this case. Further, the panel undoubtedly acted in good faith with respect to FINRA's rule on panel composition

---

[11]Respondents hotly dispute Stone's contention that Marston was not qualified to sit as a public arbitrator.  (See Doc. No. 20-3, at 30-32).  We have reviewed the parties' respective arguments and conclude that the issue turns on such interpretive nuances as whether we should quantify the closeness of Dr. Marston's relationship to the securities industry in terms of time spent or money earned.  We need not resolve this particular disagreement because we hold that the circumstances do not warrant vacatur under Section 10(a)(4) even if FINRA improperly designated Marston as a public arbitrator.

(two public arbitrators and one non-public arbitrator).  After all, FINRA *classified Marston as a public arbitrator*; we see nothing to suggest that any of the panelists doubted the propriety of this designation.  See Bulko v. Morgan Stanley DW Inc., 450 F.3d 622, 625-26 (5th Cir. 2006) (holding that "[i]n the absence of a specific agreement to the contrary, determining [arbitrator's] qualifications and eligibility is a matter left to the NASD [FINRA's precursor].") (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 85 (2002)).

Third, several courts, including the Third Circuit, have recognized that "harmless" or "trivial" instances of an arbitrator overstepping his or her authority do not justify vacatur under Section 10(a)(4).  See, e.g., Brentwood Med. Assocs. v. United Mine Workers of Am., 396 F.3d 237, 241-43 (3d Cir. 2005) (arbitrator's mistaken addition of language to collective bargaining agreement did not warrant vacatur because "arbitrator's error was harmless, since he would have arrived at the [same] conclusion" anyway); R.J. O'Brien & Assocs., Inc. v. Pipkin, 64 F.3d 257, 263 (7th Cir. 1995) (holding that "[a] 'trivial departure' from the parties' agreement, however, may not bar enforcement of an award" under Section 10(a)(4).) (citation omitted).

In Bulko, the Fifth Circuit confronted circumstances very similar to those alleged here.  Like Stone, Simon Bulko lost millions of dollars in bad investments and blamed his broker (Morgan Stanley).  And like Stone, Bulko initiated an arbitration with NASD, now FINRA, to recoup his losses.  Bulko, 450 F.3d at 623.  Bulko lost in arbitration, but a district court vacated the award for Morgan Stanley, concluding that "one of the arbitrators was not properly qualified; and, therefore, the arbitration panel acted outside the scope of its authority."  Id.  The Fifth Circuit reversed and reinstated the award.  Id. at 627.

Factually, NASD rules then in effect, like the FINRA rules at issue here, required a three-member panel consisting of two public, and one non-public, arbitrators.  Id. at 623.  Following

25

the adverse arbitration award, Bulko found out that the designated non-public arbitrator had not practiced law for several years.  In Bulko's estimation, this precluded her from serving as a non-public arbitrator and invalidated the award under Section 10(a)(4).  Id. at 623-24.  The Fifth Circuit rejected this argument on several grounds.  For one, the court reasoned that:

> Because the parties' agreement (contract) did not have a specific method-of-selection clause, appointing Marshall as the panel's non-public arbitrator was arguably not a departure from their agreement.  It called for any dispute to be decided by NASD arbitration.  For disputes involving more than $50,000, NASD arbitration rules call for an arbitration panel consisting of two public arbitrators and one non-public arbitrator.  That is what Bulko and Morgan Stanley received, with the NASD classifying Marshall as the non-public arbitrator.

Id. at 626.  This mirrors the situation we face here.  Stone has not submitted any contract or agreement specifying a method-of-selection clause; rather, like Bulko, Stone relies on the boilerplate language in the parties' Uniform Submission Agreement which generally calls for FINRA rules to govern the arbitration.  (Doc. No. 19 Ex. V).  And like Bulko, Stone received an arbitration panel consisting of two public arbitrators and one non-public arbitrator, at least as classified by FINRA.  As such, Stone's Section 10(a)(4) argument fails, just as Bulko's did.

The Bulko court also reasoned that even if the challenged arbitrator's "selection contradicted the parties' agreement, it was, at most, a trivial departure not warranting vacatur."  Bulko, 450 F.3d at 626 (citation omitted).  In particular, the Bulko court opined that "[b]ased on her work experience, Marshall fulfilled the purpose of a non-public arbitrator, which is to serve as an industry insider on the arbitration panel."  Id.  Using this functional approach, we find that Marston adequately fulfilled her role as a public arbitrator because she (through her husband) was not overly tied to the securities industry.  (See "Evident Partiality" section, supra).  Therefore, vacatur under § 10(a)(4) is not appropriate.

Citing Bulko, Stone points out that courts "do not hesitate to vacate an award when an arbitrator is not selected according to the contract-specified method."  Bulko, 450 F.3d at 625 (citing Brook v. Peak Int'l Ltd., 294 F.3d 668, 672-73 (5th Cir. 2002) (in which "contract required the American Arbitration Association (AAA) to submit a list of nine names as potential arbitrators and instructed the parties 'alternately to strike names from the list until only one remained'. . . [but] the AAA provided a list of 15 arbitrators and told the parties to strike the unacceptable names and then rank by preference the 'remaining candidates'"); Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos, 25 F.3d 223 (4th Cir.1994) (vacating award where arbitration agreement called for appointment of arbitrators by mutual agreement, but arbitral body appointed panel without parties' input, despite objections); Avis Rent A Car Sys., Inc. v. Garage Emps. Union, Local 272, 791 F.2d 22, 25 (2d Cir. 1986) (vacating award when arbitrator was appointed by city mediation board instead of AAA, as contract required)).

However, these cases are distinguishable from Stone's because they "involve deviations from contract provisions prescribing the method for selecting arbitrators," while Stone (like Bulko) bases his § 10(a)(4) challenge on a violation of FINRA rules.  Bulko, 450 F.3d at 625.  Stated differently, FINRA's selection *method* was followed in Stone's case (random generation of three lists -- public, non-public, and chairperson -- with the parties ranking and striking arbitrators from each list); Stone actually seeks to challenge Marston's *qualifications* to serve pursuant to that method.  Id.

This is an important distinction.  FINRA arbitrators owe their power to FINRA (and, of course, the parties' agreement to participate in FINRA arbitration).  FINRA classified Marston as a public arbitrator, even after she disclosed information about her husband's ties to the financial industry.  Therefore, neither Marston nor the rest of the arbitration panel exceeded their powers by presiding over Stone's dispute with Bear Stearns.  To hold otherwise would risk turning every minor

27

violation of FINRA rules, even unknown by FINRA at the time of the arbitration, into grounds for vacatur.  This would run counter to the policy in this country favoring the finality of arbitration awards, as well as the Supreme Court's recent admonitions in <u>Hall Street</u> that "exceed[ing] . . . powers" in Section 10(a)(4) is a species of "extreme arbitral conduct," 552 U.S. at 586, and <u>Stolt-Nielsen</u> that Section 10(a)(4) attacks must fail unless the "arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.'" 130 S. Ct. at 1767 (citation omitted).

Finally, Stone does not object to the selection of the two arbitrators other than Marston.  Stone has provided no evidence, or even argument, that Marston improperly influenced or prejudiced either other arbitrator against Stone or in favor of Respondents.  Because the three-person panel unanimously denied Stone's claims, Marston's presence on the panel, even if improper under FINRA's "public arbitrator" definition, did not prejudice Stone and does not mandate vacatur under Section 10(a)(4).  See <u>Winfrey v. Simmons Foods, Inc.</u>, 495 F.3d 549, 552-53 (8th Cir. 2007) (affirming district court's rejection of challenge to arbitration award because petitioner produced "no evidence indicating that [one arbitrator's] partiality deceived or misled the other two arbitrators," so alleged partiality of one arbitrator worked no prejudice); <u>Tamari v. Bache Halsey Stuart Inc.</u>, 619 F.2d 1196, 1200-01 (7th Cir. 1980) (rejecting evident partiality challenge to unanimous arbitration decision, in part because "[s]imple mathematics indicates that the particular composition of the panel should not have mattered under these circumstances."); <u>Fort Hill Builders, Inc. v. Nat'l Grange Mut. Ins. Co.</u>, 866 F.2d 11, 14 (1st Cir. 1989) (rejecting challenge to arbitration award because "the panel decision was unanimous for plaintiff, and defendants alleged no wrongdoing on the part of the other two members."); <u>Cont'l Cas. Co. v. Staffing Concepts, Inc.</u>, No. 8:09–CV–02036, 2011 WL

7459781, at *6 n.5 (M.D. Fla. Dec. 20, 2011) (listing district court cases in which courts refused to vacate unanimous arbitration awards).

       F.     <u>Stone Has Waived His Section 10(a)(2), (a)(3), and (a)(4) Challenges to the Award</u>

As explained in detail above, we see no proper grounds for vacating the panel's decision under the FAA's "evident partiality" prong, § 10(a)(2); or "misbehavior" prong, § 10(a)(3), or "exceeding powers" prong, § 10(a)(4).  But even assuming the circumstances warranted vacatur, Stone cannot rightfully contest the award based on his newly-discovered evidence because he failed to investigate the arbitrators as diligently *before* the arbitration as he did *after* he lost.  Since all of Stone's arguments for vacatur ultimately rest on the Dr. Marston-related information Stone discovered after the panel ruled against him, Stone has waived his §§ 10(a)(2)-, (a)(3)-, and (a)(4)-based challenges to the adverse arbitration award.

Arbitration retains its appeal as an alternative to litigation only if the parties involved can rely on the arbitrators' decision.  In other words, a reasonable person would surely hesitate to arbitrate a dispute in the first place knowing that he or she may very well have to litigate or re-arbitrate the same dispute again.  Therefore, courts worry about disenchanted arbitration losers improperly seeking a second bite at the apple, which would undermine the finality of arbitration awards (and thus arbitration itself).  The Seventh Circuit captured the essence of this concern in its <u>Leatherby</u> opinion:

> We do not want to encourage the losing party to every arbitration to conduct a background investigation of each of the arbitrators in an effort to uncover evidence of a former relationship with the adversary.  This would only increase the cost and undermine the finality of arbitration, contrary to the purpose of the United States Arbitration Act of making arbitration a swift, inexpensive, and effective substitute for judicial dispute resolution.

<u>Leatherby</u>, 714 F.2d at 683; <u>see</u> <u>also</u> <u>Commonwealth Coatings</u>, 393 U.S. at 151 (fearing that "a suspicious or disgruntled party [might] seize on [an arbitrator's non-disclosure] as a pretext for invalidating the award.") (White, J., concurring).

The concept of waiver grew up against this backdrop.  In broad strokes, "waiver" in the present context means that a court may affirm an arbitration award "where a party contesting the award either knew or should have known about the conflict giving rise to the contestation," despite the responsibility of arbitrators to disclose.  Merrick T. Rossein, 1 Emp't Discrimination Law & Litig. § 13:75.50 (2011).  "The waiver principle is meant to actuate the policy of the FAA in favoring the finality of arbitration awards [as] well as reinforce arbitration as a cost-effective means of settling disputes."  Id.

The Third Circuit has never published a precedential opinion on whether, and under what circumstances, the waiver doctrine applies to failure-to-disclose-type challenges to arbitration awards.  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente, 272 Fed. App'x 174, 176 n.4 (3d Cir. 2008).  However, the Third Circuit has generally approved of waiver in the arbitration context.  See Amalgamated Meat Cutters & Butcher Workmen of N. Am., Local 195, AFL-CIO v. Cross Bros. Meat Packers, Inc., 518 F.2d 1113, 1121 n.19 (3d Cir. 1975) (remarking that "a 'loser is not permitted for the first time to raise an objection to the arbitration panel after the award has been made.'") (citation omitted).  Additionally, a Third Circuit panel has held that waiver may apply to an arbitration loser's evident partiality challenge.  See Arco Enters., Inc. v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Canada, Local No. 31, 124 Fed. App'x 710, 713 (3d Cir. 2005) (non-precedential).  Given all this, as well as (1) the importance of the finality of arbitration awards and (2) the need to curtail undesirable tactical behavior by losing parties grasping for a re-do, we believe the Third Circuit would endorse the idea of waiver in failure-to-disclose-type arbitration award challenges (in the appropriate circumstances, of course).

But that does not end our inquiry.  Courts have split on the conditions precedent for waiver to apply.  Some courts limit waiver to situations in which the party seeking review of an arbitration

award had *full knowledge* of the facts beforehand, but despite that knowledge, did not object until he or she lost.  See, e.g., Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1359 (6th Cir. 1989) (no waiver of evident partiality challenge unless challenger knew "all the facts" supporting the alleged bias during the proceedings); Early v. Eastern Transfer, 699 F.2d 552, 558 (1st Cir. 1983) (same); Middlesex Mut. Ins. Co. v. Levine, 675 F.2d 1197, 1204 (11th Cir. 1982) (holding that "[w]aiver applies only where a party has acted with full knowledge of the facts.").  We will call this the "actual knowledge" approach.

Other courts take a broader view of waiver, holding that waiver applies if a party either knew or *should have known* of the arbitrator's later-complained-of conflict or bias, which constructively puts the party on notice.  See, e.g., Lucent, 379 F.3d at 28 (2d Cir. 2004) (stressing that the Second Circuit has "declined to vacate awards because of undisclosed relationships where the complaining party should have known of the relationship . . . or could have learned of the relationship just as easily before or during the arbitration rather than after it lost its case.") (citations and internal quotations omitted); Remmey v. PaineWebber, Inc., 32 F.3d 143, 148 (4th Cir. 1994) (worrying that "[i]f . . . challenge [based on information that could have been discovered beforehand] were sustained, nothing would stop future parties to arbitration from obtaining allegedly disqualifying information, going through with the proceedings, and then coming forward with the information only if disappointed by the decision."); Fidelity Fed. Bank, FSB v. Durga Ma Corp., 386 F.3d 1306, 1313 (9th Cir. 2004) ("constructive knowledge" of potential partiality of arbitrator is enough for waiver) (citing JCI Commc'ns, Inc. v. Int'l Bhd. of Elec. Workers, Local 103, 324 F.3d 42, 52 (1st Cir. 2003), and Kiernan v. Piper Jaffray Cos., Inc., 137 F.3d 588, 593 (8th Cir. 1998)); Van Pelt v. UBS Fin. Servs., No. 3:05CV477, 2006 WL 1698861, at *3 (W.D.N.C. June 14, 2006) ("It is well-settled that a complaining party does not have 'two strings to the bow,' and generally a party waives the right to

challenge the decision based on evident partiality when it knew, or could have known, of facts suggesting partiality of an arbitrator but waited until an adverse award to pursue its concern."). We will call this the "should have known" approach.

We believe the "should have known" approach is more sound. For one thing, limiting waiver to situations involving "actual knowledge" would encourage willful blindness, which we certainly do not wish to do. For another, the "should have known" approach best reflects federal policy favoring the finality of arbitration awards. See Durga Ma, 386 F.3d at 1313 ("Holding that the waiver doctrine applies where a party to an arbitration has constructive knowledge of a potential conflict but fails to timely object is the better approach in light of our policy favoring the finality of arbitration awards."). We do see some virtue in the "actual knowledge" approach, e.g., in fostering (more) arbitrator disclosure on the front-end, but not enough to tip the scales.

Under this standard, Stone undoubtedly waived his "evident partiality," "misbehavior," and "exceeding powers" challenges to the arbitration award at issue here. All three challenges stem from the allegedly non-disclosed information about Dr. Marston that Stone discovered in his belated, post-award investigation. By his own admission, Stone could have done this research earlier in the process but did not. Instead, Stone waited until he lost and then almost immediately began scouring the internet for anything that might suggest one arbitrator or another was biased against him. Stone spent approximately twenty (20) hours on this task, researching not one, but all three arbitrators looking for evidence of partiality. This is exactly the kind of undesirable strategic behavior that the waiver doctrine is designed to prevent. As aptly stated by the Seventh Circuit in remarkably similar circumstances:

> It is true that [arbitrator] disclosure requirements are intended in part to avoid the costs of background investigations. But this is a $10 million case. If [petitioner] had been worried about putting its fate into the hands of someone who might be [biased], it would have done more than it did to find out about [the arbitrator]. That

> it did so little suggests that its fear of a prejudiced panel is a tactical response to
> having lost the arbitration . . . We do not want to encourage the losing party to
> every arbitration to conduct a background investigation of each of the arbitrators in
> an effort to uncover evidence of [bias].

Leatherby, 714 F.2d at 683.  This reasoning applies equally to Stone and supports our conclusion that Stone waived his right to challenge the award by waiting to conduct his full-blown background investigation until after he lost.

The fact that Stone relied on his attorneys to select the arbitration panel in the first instance does not compel a different result.  According to one of Stone's lawyers, Stone had no involvement in either investigating or ranking the arbitrators during the arbitration selection process.  Instead, Stone's attorneys handled the arbitrator due diligence, researching the potential arbitrators (including Marston) by running internet searches and reviewing their ADRs and past awards.  Despite their efforts, Stone's lawyers did not learn about Dr. Marston and his ties to the securities industry until Stone told them after the award.

However, even assuming Stone's attorneys' investigatory efforts inure to Stone's benefit for the purposes of waiver, we see nothing in the record to indicate that Stone (either himself or through his attorneys) researched the arbitrators nearly as thoroughly *before the arbitration* as he did *after he lost*.  Under these circumstances, we think waiver is appropriate.  The Second Circuit would agree. See Lucent, 379 F.3d at 28 (remarking that the Second Circuit has "declined to vacate awards because of undisclosed relationships where the complaining party should have known of the relationship . . . or *could have learned of the relationship just as easily before or during the arbitration rather than after it lost its case*.") (citations and internal quotations omitted) (emphasis added).

This requirement places no undue burden on the parties to an arbitration.  To preserve failure-to-disclose-type challenges to an arbitration award, the parties simply need to exercise as much

diligence and tenacity in ferreting out potential conflicts *ex ante* (in selecting the panel) as they do *ex post* (once attacking the award becomes the sole reason to research the arbitrators).  Anything less would allow, if not encourage, sore losers to do exactly what Stone did in this case: run a post-award background check on each and every arbitrator, not because he perceived any bias during the arbitration, but simply as a tactical response to losing.

G.    Confirmation of Award

"Under the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16, a district court with jurisdiction over an arbitration award must confirm the award when asked to do so," Szuts v. Dean Witter Reynolds, Inc., 931 F.2d 830, 831 (11th Cir. 1991), "unless the award is vacated, modified, or corrected."  9 U.S.C. § 9.  Here, Respondents have petitioned to confirm the arbitration award at issue, FINRA Arbitration Case No. 08-01185, and we have jurisdiction because the arbitration took place in Philadelphia.  9 U.S.C. § 9 ("application [to confirm award] may be made to the United States court in and for the district within which such award was made.").  We have not vacated, modified, or corrected the award for all the reasons previously discussed, so we confirm the award accordingly.

H.    Attorneys' Fees and Costs

Respondents seek reimbursement for attorneys' fees and costs incurred in defending against Stone's motion to vacate.  The FAA does not typically provide for an award of attorneys' fees to a party who is successful in confirming an arbitration award.  Instead, we award attorneys' fees if the party challenging the award (here, Stone) "acted without justification" or "did not have a reasonable chance to prevail."  Chauffeurs, Teamsters & Helpers, Local Union No. 765 v. Stroehmann Bros. Co., 625 F.2d 1092, 1094 (3d Cir. 1980) (citations and internal quotations omitted); Wilkes Barre Hosp.

Co., LLC v. Wyo. Valley Nurses Ass'n Pasnap, 453 Fed. App'x 258, 261 (3d Cir. 2011) (non-precedential) (same).

Under the circumstances, we decline to award attorneys' fees in this matter.  The case involved a rather unusual set of facts, and resolving the dispute between Stone and Respondents required us to confront several open questions of law.  Given this factual and legal complexity, we cannot say that Stone "acted without justification" in challenging the award, or that he "did not have a reasonable chance to prevail."

IV.     Conclusion

For the aforementioned reasons, we DENY Petitioner Laurence Stone's Amended Petition to Vacate (Doc. No. 19) and GRANT Respondents' Cross-Petition to Confirm Arbitration Award (Doc. No. 20).  We also DENY Respondents' request for attorneys' fees and costs.  The Clerk of Court is directed to close this matter for statistical purposes.

                                    BY THE COURT:

                                    /s/ Legrome D. Davis

                                    Legrome D. Davis, J.